IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Criminal Action Number** |
| | ) | **13-00054-01-CR-W-DW** |
| **Kyle Kessler,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE WITH SUGGESTIONS (Doc. #23) filed on July 10, 2013, by defendant Kyle Kessler ("Kessler"). On September 13, 2013, the undersigned held an evidentiary hearing on Kessler's motion. Kessler was present and represented by his counsel, Federal Public Defender Stephen Moss. The government was represented by Assistant United States Attorney Christina Tabor. At the evidentiary hearing, testimony was provided by a single witness: Officer Warner Stumpenhaus with the Kansas City Missouri Police Department. Additionally, the following exhibits were admitted into evidence

| Number | Description |
|---|---|
| Gov't #1 | Dash-cam transcript [Stumpenhaus] |
| Gov't #2 | Dash-cam transcript [Grizzofi] |
| Gov't #3 | Dash-cam video |
| Gov't ##4-5 | Photographs |
| Gov't # B | Supplemental investigation report |
| Def't ##1-2 | Police reports |
| Ex. A | Stipulation re: Ex. B |
| Ex. B | Supplemental investigation report |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. On February 7, 2013, Warner Stumpenhaus was employed as a uniformed patrol officer with the Kansas City Missouri Police Department, patrolling in a marked police vehicle. Tr. at 4-6.

2. On the afternoon of February 7, 2013, at approximately 3:00 p.m., Officer Stumpenhaus was patrolling on the 5100 block of Booth Street near the area of Raytown Road and Blue Ridge Cutoff in Kansas City. Def't # 1; Tr. at 6-7, 10.

3. Officer Stumpenhaus was investigating the whereabouts of a white Ford truck that – over the prior two days – had twice refused to pull over in response to sirens and lights and instead had fled. Def't #1; Tr. at 7-9.

4. Officer Stumpenhaus believed that he may have seen the truck previously parked in the front of the residence at 5136 Booth – a location where Officer Stumpenhaus had previously made arrests for drug possession. Def't #1; Tr. at 8-10, 37.

5. As Officer Stumpenhaus drove south along the 5100 block of Booth, he noticed a silver Chevrolet Aveo parked in the middle of the street [on the east side of Booth] where it would obstruct northbound traffic. Def't #1; Tr. at 10-12, 16, 37, 66.

6. Approximately one hour earlier, Officer Stumpenhaus had driven through the 5100 block of Booth and had not seen any such vehicle parked in the street obstructing traffic. Gov't # B, Tr. at 47-48, 53-54.

7. As Officer Stumpenhaus approached the Aveo in his patrol car, he noted a male in a red shirt walking onto the residential yards of residences located on the west side of Booth, approximately 21 to 45 feet from the Aveo (which was parked on the east side of Booth). Def't #1; Tr. at 16, 67.

8. The man was later identified as Kessler. 22

9. Officer Stumpenhaus then engaged Kessler in a conversation:

Stumpenhaus: Yo! Hey is that your car?

*Kessler: A guy just took off around the block.*

Stumpenhaus: [inaudible]

*Kessler: The other one was like [inaudible].*

Stumpenhaus: Is he white or black?

*Kessler: And the other dude was just some sort of white boy.*

Stumpenhaus: Okay so you saw him get out of the car?

*Kessler: Yeah.*

Stumpenhaus: Okay.

*Kessler: We told him ta get outta here. And he took off running. . . Two of em' . . .*

Stumpenhaus: Alright. It's been there all day?

*Kessler: All day.*

Stumpenhaus: Well when did they take it? Did they take off from it?

*Kessler: Nah, it's been parked on the side right here. But they just moved it, I don't know what happened to the car. They went [inaudible] straight through here.*

Stumpenhaus: [To Kessler] Come here sir. [To the dispatcher] Hold me out on an abandoned auto. [To Kessler again] Put your hands on the hood . . . put your hands behind your back. You're not under arrest you're just being detained for my safety right now okay?

Gov't # 1; Tr. at 16-18.

10. Thereafter, Officer Stumpenhaus proceeded to handcuff and frisk Kessler uncovering an unloaded revolver. Def't #1; Tr. at 20-21, 23.

3

11. During the encounter, Officer Stumpenhaus noted that Kessler was "breathing heavily." Def't # 1; Tr. at 18-19, 24, 27-28.

12. Officer Stumpenhaus had no prior history or encounters with Kessler. Tr. at 40, 57, 59.

13. Prior to handcuffing Kessler, Officer Stumpenhaus had not seen any indications that Kessler was involved in drug distribution or drug possession. Tr. at 40-41.

14. Officer Stumpenhaus never saw Kessler in the Aveo. Tr. at 41.

15. Officer Stumpenhaus never saw Kessler run from him, walk away from him or make any furtive movements. Tr. at 44-45.

16. Officer Stumpenhaus saw nothing in Kessler's appearance to lead him to believe that Kessler was armed and dangerous. Tr. at 70

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Kessler challenges the admissibility of any evidence obtained during the initial search and seizure of his person on February 7, 2013, as well as the fruits of that search and seizure. With regard to the initial encounter between Kessler and Officer Stumpenhaus, the government argues that the seizure of Kessler was justified based on reasonable suspicion under *Terry*.

It is axiomatic that the Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, however, the Constitution does not forbid all searches and seizures, but only unreasonable searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the
> common law, than the right of every individual to the possession
> and control of his own person, free from all restraint or
> interference of others, unless by clear and unquestionable authority
> of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion – supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id*. at 30, 88 S.Ct. at 1884-85. However, the officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id*. at 27, 88 S.Ct. at 1883. Moreover, the mere fact that an officer's suspicion or hunch, in fact, was well-founded is not dispositive for a constitutional analysis; rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

The concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329 (1983). In large part, common sense dictates the analysis of reasonable suspicion.

> The process does not deal with hard certainties, but with
> probabilities. Long before the law of probabilities was articulated
> as such, practical people formulated certain common-sense
> conclusions about human behaviors; jurors as fact-finders are
> permitted to do the same and so are law enforcement officers.

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695 (1981). As such, in evaluating the validity of a *Terry* stop, "the totality of the circumstances – the whole picture" must be considered. Id. at 417, 101 S.Ct. at 695.

In evaluating the encounter between Kessler and Officer Stumpenhaus in this case, it must be noted that, at least initially, no Constitutional rights were even implicated. It is well-settled that:

> Not all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment. A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment.

*United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001). *See also Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991) (Fourth Amendment jurisprudence makes "it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions"); *United States v. Richards*, 611 F.3d 966, 968-69 (8th Cir. 2010). As such, Officer Stumpenhaus was entitled to ask general questions of Kessler near the site of the abandoned Aveo. By that same reasoning, Kessler was free to answer the officer's questions or, alternatively, to simply walk away. As summarized by the Eighth Circuit:

> There is no *per se* requirement that an officer inform a citizen of his right to refuse consent, and there is no presumption that consent is invalid where given without an explicit notification of the right to refuse. That many people agree to speak with police when asked does not tend to suggest that reasonable persons do not feel free to decline: While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response.

*United States v. Vera*, 457 F.3d 831, 834-35 (8th Cir. 2006) (*citations and internal quotations omitted*).

However, it is well understood that a consensual encounter may lose its consensual nature and thus become an unlawful seizure. *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010). The determination of when an encounter between law enforcement and a citizen rises to the level of non-consensual (and thus triggers the Fourth Amendment) is "a fact intensive one which turns upon the unique facts of each case." *Jones*, 269 F.3d at 925. A non-consensual encounter may arise when "a person has been 'seized' within the meaning of the Fourth Amendment [that is], in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1872-73 (1980). *See also United States v. Flores–Sandoval*, 474 F.3d 1142, 1145 (8th Cir.2007) ("A consensual encounter becomes a seizure implicating the Fourth Amendment when, considering the totality of the circumstances, . . . a reasonable person would not have believed himself free to leave."); *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988) (an initially consensual encounter between a law enforcement officer and a citizen "can ripen into a seizure requiring reasonable suspicion"); *Davis*, 202 F.3d at 1063 ("an individual's actions during a consensual encounter may both crystallize previously unconfirmed suspicions of criminal activity and give rise to legitimate concerns for officer safety"). When Officer Stumpenhaus placed Kessler in handcuffs, a Fourth Amendment seizure took place requiring some Fourth Amendment justification.[1]

As previously noted, the government argues that the seizure of Kessler was justified based on reasonable suspicion under *Terry*. In that regard, at the time that Officer Stumpenhaus seized and searched Kessler, he was aware that:

---

[1] While "mere police questioning does not constitute a seizure," the Fourth Amendment does come into play "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991). It should be noted that even if Officer Stumpenhaus had not handcuffed Kessler, the ensuing "protective frisk [was] both a search and a seizure for Fourth Amendment purposes." *United States v. Gray*, 213 F.3d 998, 1000 (8th Cir. 2000).

- Other criminal activity had occurred at or near some of the residences on the 5100 block of Booth,

- Kessler appeared nervous and was "breathing heavily," and

- Officer Stumpenhaus found Kessler's answers to the officer's questions to be "inconsistent."

The government offers no additional arguments in support of reasonable suspicion.

Viewing the totality of the circumstances, the Court concludes that a reasonable officer armed with these facts in this situation would not have an objectively reasonable suspicion that Kessler was involved in criminal activity or that such activities "may be afoot." An illustrative case is *United States v. Jones*, 606 F.3d 964 (2010) (*Jones II*[2]).

In *Jones II*, a police officer was conducting a routine patrol in a high-crime area when he observed the defendant walking across a church parking lot wearing a long-sleeved hooded sweatshirt and "clutching the front area of his hoodie pocket in his right hand." *Id*. at 965. The officer noted that the defendant "watched as the marked cruiser drove by." *Id*. The officer decided to stop and frisk the defendant. The search disclosed a 9-mm handgun in the front hoodie pocket. After the district court suppressed the evidence found in the search, the government appealed.

On appeal, the government argued that the officer's actions were supported by reasonable suspicion in that:

- The officer had been trained to look for clues that an individual is carrying a firearm, such as walking with his hand held against his midriff, as if holding something against his body,

- The officer, in his four years as a cruiser officer, had stopped ten other people walking in this manner, and every one was carrying a firearm,

---

[2] The 2010 decision is cited as *Jones II* to distinguish it from the 2001 Eighth Circuit case also involving a defendant named "Jones" that is cited earlier in this Report and Recommendation.

- The defendant was walking in a high crime precinct in a neighborhood considered to be a violent "hot spot," in that precinct,

- It was sunny and 68 degrees, so the defendant by wearing a long-sleeved sweatshirt "was obviously hiding something he did not want the world, and the cruiser officers, to see," and

- The defendant "continually watched the officers [as the cruiser drove by] as if concerned that they would stop him."

*Id.* at 966. Notwithstanding these facts, the Court concluded that the articulated facts did not support a finding of reasonable suspicion, in part, noting that several of the "suspicious circumstances," *e.g.*, walking in a high-crime area, wearing a sweatshirt on a September day, and intently watching a police cruiser drive by, "all were shared by countless, wholly innocent persons." *Id.* at 967. In this case, the Court likewise finds that the suspicious circumstances relied upon by the government are too easily characteristic of wholly innocent citizens so as to justify the warrantless search and seizure of Kessler.

While there was limited testimony that some individuals had been arrested for methamphetamine possession near some of the residences on the 5100 block of Booth, such a fact adds little to the reasonableness of the suspicions surrounding Kessler. Indeed, Officer Stumpenhaus specifically testified that prior to handcuffing Kessler, the officer had not seen any indications that Kessler was involved in drug distribution or drug possession.

With regard to Kessler's "heavy breathing," it is true an individual's "nervousness" and "furtiveness" may support a finding of reasonable suspicion. *See*, *e.g.*, *United States v. Atlas*, 94 F.3d 447, 451 (8th Cir. 1996) ("[m]ost significant[ ]" in establishing reasonable suspicion were the facts that the suspect's eyes grew wide when he saw the officer, he threw down a bag he was holding, he began to walk away, and he exhibited nervousness in responding to the officer's questions). However, in this case, the recording of Kessler does not reveal a level of anxiety disproportionate to any citizen's encounter with law enforcement.

Finally, and most importantly, the supposed "inconsistencies" in Kessler's answers to the questions posed by Officer Stumpenhaus – <u>to the extent they exist at all</u> – simply do not support an objectively reasonable belief that criminal activity was afoot. First, there is no evidence in the record that connects Kessler to the Aveo or any of the activity surrounding it. Second, although Office Stumpenhaus described Keller's statements about the Aveo as inconsistent, the record does not support that description. Officer Stumpenhaus testified that he had driven down the street earlier in the day and, at that time, the Aveo was not parked in the street blocking traffic. According to Officer Stumpenhaus, Kessler said the Aveo had been there all day -- and it was this statement the officer found inconsistent. However, the Dash-Cam video transcript, [Govt 1] indicates that Kessler responded to Officer Stumpenhaus as follows:

> Stumpenhaus: Well when did they take it? Did they take off from it?
>
> *Kessler:* *Nah, it's been parked on the side right here. But they just moved it, I don't know what happened to the car.*

This suggests Kessler saw the car in the area earlier in the day, but that it had just been moved to its position in the street blocking traffic. Officer Stumpenhaus even testified that, while the Aveo had not been parked in the street blocking traffic earlier in the day, he did not know whether or not it had been legally parked in the area earlier in the day. Kessler's statements simply do not appear to be inconsistent. Even to the extent they could be deemed inconsistent, they do not rise to the level of reasonable suspicion.

In viewing these factors, the Court has carefully considered them in combination within the totality of the circumstances facing Officer Stumpenhaus. The Court is mindful of the experience and training received by officers and the difficult tasks such officers must perform on a daily basis, often making snap judgments that will be minutely dissected after-the-fact by attorneys and judges. But "[t]here are limits . . . to how far police training and experience can go

10

towards finding latent criminality in innocent acts." *Johnson v. Campbell*, 332 F.3d 199, 208 (3rd Cir. 2003). In this particular case, under these unique facts, the officer seemingly relied more on a hunch than facts. Under established Fourth Amendment jurisprudence, the fact that Officer Stumpenhaus' hunch was correct does not establish reasonable suspicion.

Inasmuch as the Court finds the search and seizure of Kessler was unconstitutional, the fruits of that search and seizure must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407 (1963).

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **GRANTING** the MOTION TO SUPPRESS EVIDENCE WITH SUGGESTIONS (Doc. #23) filed on July 10, 2013, by defendant Kyle Kessler.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

                                                              */s/ John T. Maughmer*
                                                          **John T. Maughmer**
                                       **United States Magistrate Judge**